SIGNED this 27th day of June, 2014

_____
John C. Cook
UNITED STATES BANKRUPTCY JUDGE

_____

**IN THE UNITED STATES BANKRUPTCY COURT FOR
THE EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **In re** | ) | |
| | ) | |
| **Luken Communications, LLC** | ) | No. 13-13069 |
| | ) | **Chapter 11** |
| **Debtor** | ) | |
| _____ | ) | |
| | ) | |
| **Luken Communications, LLC** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| v. | ) | Adv. No. 14-1023 |
| | ) | |
| **Jim Owens Entertainment, Inc.** | ) | |
| | ) | |
| **Defendant** | ) | |

**M E M O R A N D U M**

The complaint initiating this adversary proceeding seeks the partial disallowance of the defendant's claim for the purpose of determining (1) the distribution on the claim under any chapter 11 plan that may be confirmed in this case, and (2) the amount that must be paid in con-

nection with the assumption of executory contracts between the parties.[1] Having considered the evidence presented at trial and the arguments and briefs of the parties, the court now makes its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, as made applicable in bankruptcy adversary proceedings by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

## I.

On May 20, 2011, the parties entered into eleven license agreements whereby defendant Jim Owens Entertainment, Inc. ("JOE"), licensed certain television programs to debtor and plaintiff Luken Communications, LLC, and, on March 6, 2012, the parties entered into one additional license agreement for certain television episodes from the series *Music City Tonight*. At the outset, the court notes that there is no dispute with respect to four of the license agreements.

*Country Performances.* The "Country Performances" agreement was for 1,500 episodes for a fee of $200.00 per episode. JOE acknowledges that the debtor never received any episodes, and so does not owe anything under that contract. The debtor proposes to reject this license agreement, but to assume all of the others.

*Country Standard Time.* The original "Country Standard Time" agreement was for twenty-six thirty- minute episodes for a fee of $750.00 per episode, but the parties modified the agreement to provide for 129 sixty-minute episodes and a fee of $1,250.00 per episode. The

---

[1] On March 18, 2014, the court consolidated this proceeding with the motion to assume the executory contracts and the objection to claim that the debtor had filed in its chapter 11 case.

debtor received all 129 episodes, and so it is obligated to pay license fees with respect to 129 episodes of *Country Standard Time*.

*Funny Business.* The "Funny Business" agreement was for sixteen episodes for a fee of $1,500 per episode. The parties are in agreement that fifteen episodes were delivered, and so the debtor is obligated to pay license fees with respect to fifteen episodes of *Funny Business*.

*Year in Country Music.* The "Year in Country Music" agreement was for ten episodes for a fee of $1,500.00 per episode. The parties are in agreement that eight episodes were delivered, and so the debtor is obligated to pay license fees with respect to eight episodes of *The Year in Country Music*.

**A.**

Turning to the first category of license agreements in controversy, in two instances JOE delivered more episodes than were called for by the parties' agreements. The debtor contends that, in each case, it should not be liable for payment of the license fees for the number of episodes exceeding the number specified by the license agreement unless they were broadcast. JOE contends that the debtor should be required to pay for the additional episodes because it converted them to a digital format upon receipt. The court holds that the debtor must pay for only the number of episodes stated in the license agreements, unless the additional episodes were actually broadcast, because those agreements were never modified, either expressly or by a course of dealing. The programs and license agreements falling into this category are as follows.

*Crook and Chase.* The "Crook and Chase" agreement was for 270 episodes for a fee of $1,500.00 per episode. The debtor aired only fifty of the original 270 episodes from the 1996-97 season that the debtor had picked up from JOE, either because JOE withdrew them (according to

the debtor) or by mutual agreement (according to JOE). However, the debtor picked up tapes belonging to JOE from CBS that contained 593 additional episodes for purposes of replacing the original 270 episodes, and the debtor aired 270 of those 593 episodes. JOE contends that the debtor must pay for all 593 episodes, because the debtor has converted all of the episodes to digital format but, as noted above, the court disagrees.

The parties agreed to license only 270 episodes, and that agreement was never modified. In an email that James Owens, president and owner of JOE, sent on August 16, 2012, to Matthew Winn, an executive supervisor of the debtor's, Mr. Owens acknowledged that "we have delivered more programs than were agreed upon originally," specifically mentioning the additional episodes of *Crook and Chase* and also additional episodes of *Music City Tonight*, and stated that "we can discuss later down the road if you want to add them to the Luken library or not." There is no dispute that there were no such additional discussions. Mr. Winn also testified that it was the debtor's policy to have written license agreements for the programs that the debtor intended to broadcast.

The proof revealed that the programs the debtor received from JOE were on video tapes and that the debtor could not accurately determine the content of the tapes without manually reviewing them. When the debtor received boxes of tapes from JOE over a period of approximately eighteen months,[2] each tape was played through a tape player connected to a computer so that the content of the tape could be converted to a digital format for review, verification, and

---

[2] Although Mr. Winn testified that the tapes were received by the debtor over an eighteen- month period following the signing of the license agreements, the debtor's proof did not establish when the specific tapes relating to a particular license agreement were actually received and reviewed.

analysis. Also, because the tapes were not received at one specific time, it was necessary to convert the programs to a digital format so that the programs could be saved until all of the licensed content was received, with the tapes being returned to JOE promptly after the programs were copied. Although the debtor could not broadcast the programming without converting it to a digital format, the mere fact that the episodes were converted to a digital format during the initial review process did not indicate that the debtor had agreed to license additional episodes beyond the number set forth in the license agreements.[3] The debtor did, however, acknowledge that it was responsible for paying additional fees for broadcasting the fifty episodes from the 1996-97 season that were later withdrawn. Accordingly, the debtor is obligated to pay license fees with respect to 320 episodes of *Crook and Chase*.

*Music City Tonight*. Likewise, the "Music City Tonight" agreement was for 455 episodes for a fee of $1,750.00 per episode. JOE delivered 569 episodes, and it contends that the debtor is liable for all of them because it has digitized them all. Again, the court disagrees. Accordingly, the debtor is obligated to pay license fees with respect to 455 episodes of *Music City Tonight*.

**B.**

The second category of disputed license agreements is the converse of the first: in three instances JOE delivered fewer episodes than were called for by the parties' agreements, and the court holds that the debtor must pay for only the number of episodes delivered. The programs and license agreements falling into this category are as follows.

---

[3] At trial, Mr. Winn testified that the debtor had not yet deleted the extra programming from its hard drives because of the pending legal issues with JOE. He represented, however, that the debtor would delete the extra episodes once this controversy is resolved. The court also notes that the conversion to digital format was of benefit to JOE, as well as the debtor, because the debtor delivered digital copies of all programming to JOE at its request and without charge.

*Celebrity Kitchen.* The "Celebrity Kitchen" agreement was for 200 episodes for a fee of $750.00 per episode. JOE delivered 191 episodes and, although the debtor contended that forty-two episodes were duplicates, the court finds, based upon the testimony of Lorianne Crook-Owens, a vice-president and manager of JOE's, that there were no duplicate episodes but rather certain celebrities appeared in more than one episode of the series. Accordingly, the debtor is obligated to pay license fees with respect to 191 episodes of *Celebrity Kitchen*.[4]

*Yesteryear.* The "Yesteryear" agreement was for sixteen episodes for a fee of $1,500.00. The court finds that the debtor received only seven episodes, and so the debtor is obligated to pay license fees with respect to seven episodes of *Yesteryear*.

*Celebrities Offstage.* The final agreement that the court considers to fall within this category is the "Celebrities Offstage" agreement. The original contract was for sixteen thirty-minute episodes for a fee of $750.00 per episode, but the parties modified the agreement to license seventeen sixty-minute episodes for a fee of $1,250.00 per episode. JOE delivered all seventeen episodes, but the court finds it asked the debtor not to air six of those episodes until it had a chance to review them for content. JOE never thereafter authorized the airing of the six episodes. Accordingly, the debtor is obligated to pay license fees with respect to eleven episodes of *Celebrities Offstage*.

## C.

The final category of disputed license agreements involve situations in which the debtor now contends some of the programs do not conform to the contracts. All four of the agreements

---

[4] The debtor's contention that twelve of the episodes were defective or otherwise unusable is discussed in the next section of this opinion.

falling into this category were signed in May 2011, at which time the debtor began retrieving boxes of tapes from JOE and "ingesting" them by transferring their content to digital format. According to Mr. Winn of the debtor, part of the ingesting process involved checking the programming it received from JOE to ensure that it was covered by the license agreements. All of the tapes were received and ingested within eighteen months, i.e., by October 2012.

Yet the debtor did not raise an issue regarding nonconformities of programs to the respective licensing agreements until a month after JOE filed its proof of claim: the proof of claim was filed on November 5, 2013, and the debtor filed its motion to assume and reject executory contracts on December 11, 2013, making rather vague allegations of programming noncompliance with certain of the agreements.[5] However, it was not until nineteen months after the last tape was ingested – which was the Friday before the Monday that the trial of this adversary proceeding commenced – that the debtor identified with any specificity the manner in which it contends programs failed to conform to the licensing agreements. The court holds that the delay in giving notice to JOE precludes the debtor from relying on the nonconformities at this time.

> It is a well-established principle that –
>
> [t]he purchaser of goods upon order has the right to inspect the same upon arrival to ascertain whether or not the goods comply with the terms of his order. If they do so conform to his order he is bound to accept them. If on the contrary they fail to conform to [the] contract, he must reject them if he desires to do so. He is bound to do the one or the other and that within a reasonable time after delivery.

---

[5] The same allegations were reiterated in the complaint initiating this proceeding, which was filed on March 5, 2014.

*Carmichael & Carmichael, Inc. v. Nicholstone Cos.*, No. 01-A-01-9104-CV00148, 1992 WL 172404, at *3 (Tenn. Ct. App. July 24, 1992) (quoting *I.N. Price Co. v. Hamilton Produce Co.*, 8 Tenn. Civ. App. 467, 470 (1918)). This common law principle was carried forward with the enactment of article 2 of the Uniform Commercial Code, *see* Tenn. Code Ann. §§ 47-2-601 - 47-2-608; *see also id.* §§ 47-2A-509 - 47-2A-517 (including similar provisions governing acceptance and rejection in the case of *leases* of goods).

Specifically, UCC section 2-606 provides that goods are "accepted" when the buyer "fails to make an effective rejection" by giving notice to the seller within a "reasonable time after their delivery or tender" and after the "buyer has had a reasonable opportunity to inspect them." Tenn. Code Ann. §§ 47-2-606(b), 47-2-602(1). Rejection "is ineffective unless the buyer seasonably notifies the seller" and, if the buyer does not state any "particular defect," the buyer is precluded "from relying on the unstated defect to justify rejection or to establish breach" if the defect was of such a nature that the seller could have cured it. *Id.* §§ 47-2-602(1), 47-2-605(1). Acceptance "precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this chapter for nonconformity." *Id.* § 47-2-607(2); *see id.* § 47-2-608. However, if the buyer has accepted tender, he "must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *Id.* § 47-2-607(3)(a). In other words, a buyer receiving goods that do not conform to the contract has an obligation to notify the seller of the nonconformity and, if the buyer does not do so within a reasonable time, he will have no recourse for the nonconformity.

In this proceeding, the debtor had a "reasonable opportunity to inspect" the television programs during the period May 2011, when it began taking delivery of the tapes and digitizing them, to October 2012, when the last tape was ingested. It did not, however, put JOE on notice of any respects in which the programs did not conform to the license agreements until it filed the motion to assume and reject the agreements at least fourteen months and as long as thirty-one months after ingesting the tapes. Moreover, the debtor did not identify the alleged nonconformities with any specificity until the Friday before the Monday on which trial commenced in May 2014. Even a period of fourteen months cannot be said to constitute a "reasonable time" for the debtor to have notified JOE of the nonconformities upon which it now seeks to rely in defending against JOE's claims under the licensing agreements. Accordingly, under UCC article 2 or the Tennessee common law regarding the sale of goods, the debtor would be "barred from any remedy." *See also* Restatement (Second) of Contracts § 278(1) (providing that accepting performance offered by the obligor that differed from what is due discharges the obligation). The question remains whether these legal principles that govern the sale of goods should be applied to perpetual television program licenses.

Assuming that UCC article 2 does not apply to television program licensing agreements directly,[6] provisions of the Uniform Commercial Code are often applied by analogy to contracts not strictly within its scope. *E.g.*, *Glenn Dick Equip. Co. v. Galey Constr., Inc.*, 541 P.2d 1184,

---

[6] Article 2 applies to "transactions in goods," and some courts have been interpreted both "transaction" and "goods" in a broad manner. *E.g.*, *Architectronics, Inc. v. Control Sys., Inc.*, 935 F. Supp. 425, 431-32 (S.D.N.Y. 1996); *Richards & Assocs., Inc. v. Tenn. Forging Steel Corp. (In re Tenn. Forging Steel Corp.)*, 1978 WL 23481 (Bankr. E.D. Tenn. Feb. 28, 1978); *W. Dermatology Consultants, P.C. v. VitalWorks, Inc.*, 78 A.3d 167, 175-76 (Conn. Ct. App. 2013); *Commc'ns Grps., Inc. v. Warner Commc'ns Inc.*, 138 Misc. 2d 80, 85 (N.Y. Civ. Ct. 1988).

1188-90 (Idaho 1975). In fact, one authority has noted that "there is a strong tendency for courts to apply the UCC to non-UCC situations 'because it embodies the foremost legal thought concerning commercial transactions.' Although a particular transaction may be outside of the UCC, the court may make a selective application of those principles expressed in the UCC that reasonably would govern situations to which the statute does not explicitly apply." 1 David Frisch, *Anderson on the Uniform Commercial Code* § 1-101:35 (3d ed. database updated Sept. 2013) (quoting *Vitex Mfg. Corp. v. Caribtex Corp.*, 377 F.2d 795, 799 (3d Cir. 1967)). A leading treatise on the UCC agrees that article 2 may be applied to "nonsale transactions," and offers a "policy approach" to determining when a court should do so: "We believe that the best general approach for courts is to determine what policy objectives the particular Code section implicates and then, in light of those policies, determine whether the particular facts of the transaction invite the application of the section by analogy." 1 James J. White, Robert S. Summers & Robert A. Hilman, *Uniform Commercial Code* § 2:3 (6th ed.).

The court sees little economic distinction between a contract for the sale of goods and a contract for the perpetual licensing of television programming. The debtor effectively acquired title to the programs (albeit not to the exclusion of JOE) by acquiring the rights to exhibit the programs in perpetuity. *See Commc'ns Grps., Inc.*, 138 Misc. 2d at 85 (relying on the agreement being referred as a "perpetual license" in determining that the software license "sufficiently resembles a sale so as to bring it within the scope of the UCC"). Considering the particular license agreements in this proceeding, no reason is apparent why the court should not apply to the perpetual licenses the same principles of the common law and UCC article 2 that impose upon

the buyer of goods an obligation to inspect them and reject those that do not conform to the parties' agreements or otherwise put the seller on notice of the nonconformity.

Moreover, taking the "policy approach" espoused by White, Summers, and Hilman, one of the purposes of the UCC sections that the court is applying by analogy is to "protect the seller from stale claims and provide certainty in contractual arrangements." *Aqualon Co. v. MAC Equip., Inc.*, 149 F.3d 262, 269 (4th Cir. 1998); *see Wildman Mfg. Co. v. Davenport Hosiery Mills*, 249 S.W. 984, 986 (Tenn. 1923) (the purpose of section 49 of the Uniform Sales Act is to "prevent the buyer from interposing belated claims for damages (too often a mere afterthought) as an offset to a suit begun by the seller for the purchase price.").[7] The debtor's untimely assertions of nonconformity are the very kind of opportunism that the UCC provisions were designed to prevent. The debtor had every opportunity to inspect the programs and reject those that did not conform to the parties' agreements or otherwise put JOE on notice of the nonconformities, but did not do so until at least fourteen months – and did not do so with any specificity until at least nineteen months – after it received the tapes. Such "belated claims for damages," which appear to have been devised as an offset to JOE's claim for licensing fees, simply come too late. *Id.*

*Celebrity Kitchen.* The first contract in this category is the "Celebrity Kitchen" agreement, pursuant to which JOE delivered 191 episodes. The debtor contends that there were five episodes that were incomplete or had technical defects and seven episodes on each of which the

---

[7] Section 49 of the Uniform Sales Act was the precursor to UCC section 2-607. *See* Tenn. Code Ann. § 47-2-607 cmt. (purpose of section is "[t]o continue the prior basic policies with respect to acceptance of goods"). Other purposes of the UCC provisions upon which the court relies in this proceeding include "(1) to prevent surprise and allow the seller the opportunity to make recommendations on how to cure the nonconformance; (2) to permit the seller the fair opportunity to investigate and prepare for litigation; and (3) to open the way for normal settlement of claims through negotiation." *Aqualon*, 149 F.3d at 269.

GAC logo appeared throughout the entire program, making those episodes unusable by the debtor. However, the court has concluded that the debtor waived those objections by failing to raise them within a reasonable time. Accordingly, the debtor is obligated to pay license fees with respect to 191 episodes of *Celebrity Kitchen*.

*Country Interviews/Story Reels.* The "Country Interviews/Story Reels" agreement was for 998 "various minute" episodes for a fee of $175.35 per episode. The debtor contends that only 102 reels containing interview or story episodes were made available and that, according to a previous representation made by JOE in its sales pitch materials, the "Country interviews/story reels (1983-2010)" consisted of 998 hour reels. Ms. Crook-Owens of JOE testified that ninety-one reels of tape, containing more than 998 "various minute" episodes, were delivered to the debtor. She also testified that the agreement's reference to the return of 998 reels of tape was incorrect. The court holds that, although the agreement mentioned the return of 998 *reels*, JOE actually licensed 998 "various minute" *episodes*, irrespective of the number of reels containing them. In so holding, the court relies on Ms. Owens's testimony, the low per-episode fee, and the fact that the debtor paid $142,187.50 under the agreement and did not raise an issue about the length of the episodes prior to the initiation of this proceeding. In addition, even if the agreement is construed as requiring 998 hour-long episodes so that the programming delivered did not conform to the agreement, the court has concluded that the debtor waived those objections by failing timely to raise them. Accordingly, the debtor is obligated to pay license fees with respect to 998 interviews and story episodes.

*Country Music Specials.* The "Country Music Specials" agreement was for ninety-two episodes for a fee of $2,173.91 per episode. Two of the episodes delivered to the debtor are more

properly characterized as *Celebrity Kitchen* episodes, two are more properly characterized as *Crook and Chase* episodes, and eight are more properly characterized as *The Year in Country Music* episodes and are considered as having been delivered pursuant to those license agreements. The debtor contends that twenty-eight additional episodes did not conform to the contract for various reasons.[8] However, the court has concluded that the debtor waived those objections by failing to raise them within a reasonable time. Accordingly, the debtor is obligated to pay license fees with respect to eighty country music specials.

*Country Music Videos.* The "Country Music Videos" agreement was for 4,050 videos for a fee of $43.21 per video. The debtor received 4,331 videos, but the debtor has identified approximately 250 instances of duplication.[9] The court finds that the debtor received at least 4,050 unique music videos. The debtor also asserted that numerous other videos did not conform to the parties' agreement, primarily because they were not "country music" videos.[10] However, the court has concluded that the debtor waived those objections by failing timely to raise them. Accordingly, the debtor is obligated to pay license fees with respect to 4,050 videos.

---

[8] For example, some allegedly suffered from defects of a technical or qualitative nature, and the debtor contends that others do not constitute "specials."

[9] Ms. Owens acknowledged that there were duplicates among the videos delivered, but could not testify as to the number of duplicate videos.

[10] The debtor also asserted that a couple of the items of material do not qualify as music videos, a couple of others were incomplete, and a few suffered from technical defects.

**D.**

The foregoing information may be summarized as follows:

| Program | Episodes Delivered/ Accepted | Price per Episode | Total Fee Due |
|---|---|---|---|
| Celebrities Offstage | 11 | $1,250.00 | $13,750.00 |
| Celebrity Kitchen | 191 | 750.00 | $143,250.00 |
| Country Interviews/Story Reels | 998 | 175.35 | $174,999.30 |
| Country Music Specials | 80 | 2,173.91 | $173,912.80 |
| Country Music Videos | 4,050 | 43.21 | $175,000.50 |
| Country Performances | 0 | 200.00 | $0.00 |
| Country Standard Time | 129 | 1,250.00 | $161,250.00 |
| Crook and Chase | 320 | 1,500.00 | $480,000.00 |
| Funny Business | 15 | 1,500.00 | $22,500.00 |
| Music City Tonight | 455 | 1,750.00 | $796,250.00 |
| The Year in Country Music | 8 | 1,500.00 | $12,000.00 |
| Yesteryear | 7 | 1,500.00 | $10,500.00 |
| Total | | | $2,163,412.60 |

The parties have stipulated that the debtor has paid a total of $1,868,343.75 toward the above license fee obligations, leaving a balance of $295,068.85.

**II.**

JOE's proof of claim also includes the sum of $100,000.00 representing the amount of postpetition "performance guaranty" obligations allegedly owed under a separate Service Mark License Agreement with respect to the mark "The Nashville Network." Because the obligations were allegedly incurred postpetition, no amount due under this agreement should have been in-

Case 1:14-ap-01023-NWW   Doc 39   Filed 06/27/14   Entered 06/27/14 10:53:58   Desc
Main Document      Page 15 of 16

cluded in the proof of claim. *See* 11 U.S.C. § 502(b) (amount of claim is determined "as of the date of the filing of the petition").[11] The court will, therefore, disallow the claim to the extent of $100,000.00.[12]

### III.

For the foregoing reasons, the court will enter a judgment in this adversary proceeding and an order in the debtor's chapter 11 case disallowing the claim asserted by the proof of claim that JOE filed in the case on November 5, 2013, to the extent that it exceeds $295,068.85. The court will also authorize the debtor to reject the "Country Performances" license agreement. The judgment will provide that the debtor must pay the sum of $295,068.85 to JOE in order to cure the defaults under and assume the remaining license agreements, but will deny without prejudice the debtor's motion to assume those agreements on account of its failure to present evidence (1) of its ability to cure or provide adequate assurance that it will promptly cure the defaults, (2) of its ability to compensate or provide adequate assurance that it will promptly compensate JOE for any actual pecuniary loss resulting from the defaults, and (3) that the debtor can provide adequate assurance of any future performance under the agreements, as required by 11 U.S.C. § 365(b)(1). The debtor may file a renewed motion to assume or reject the remaining license

---

[11] While a claim arising from the rejection of a previously-unassumed executory contract is treated as a prepetition claim, 11 U.S.C. § 365(g)(1), JOE does not contend that the amount included in the proof of claim represents damages arising out of the rejection of the Service Mark License Agreement.

[12] The parties are in agreement, however, that unpaid amounts accruing postpetition (at least through the date of rejection) constitute an administrative expense, and they have asked the court to ascertain the amount of that administrative expense. The court will address that issue by a separate order that will be entered in the debtor's chapter 11 case.

agreements when it is prepared to make such showings, or may provide for such assumptions and rejections in a chapter 11 plan.

# # #